Steven G. Schulman
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
**MILBERG WEISS BERSHAD & SCHULMAN LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

Jules Brody
Aaron Brody
**STULL, STULL & BRODY**
6 East 45th Street
New York, New York  10017
(212) 687-7230

Marc A. Topaz
Richard A. Maniskas
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
Telephone:    (410) 332-0030
Facsimile:    (410) 685-1300

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **In re SCUDDER MUTUAL FUNDS FEE LITIGATION** | : **Civil Action No. 04-cv-01921 (DAB)**<br>:<br>:<br>: |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by and through their counsel, allege the following based upon the investigation

of counsel, which included a review of United States Securities and Exchange Commission

("SEC") filings, as well as other regulatory filings, reports, and advisories, press releases, media

reports, news articles, academic literature, and academic studies, and interviews with former

employees. Plaintiffs believe that substantial additional evidentiary support will exist for the

allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action based upon the wrongdoing by Defendant Scudder

Investments ("Scudder") and its subsidiaries and affiliates also named herein as Defendants, in

charging excessive fees to the Scudder Funds ("Scudder Funds" or the "Funds") and their

investors. Plaintiffs bring these claims individually and also as a class action on behalf of a

Class consisting of all persons or entities who held shares of any of the Scudder Funds at the date

of commencement of this action and who continue to hold any such shares (the "Class"), for the

purpose of asserting the claims of those persons under Sections 36(b) and 48(a) of the

Investment Company Act of 1940 (the "ICA") to recover excessive fees on behalf of the Funds

in which they hold their interests. The investment adviser fees, administrative fees, 12b-1 fees,

and other payments received by Defendants from the Funds were disproportionate to the value of

services provided, and were not within the bounds of what would have been negotiated at arm's-

length.

2.      The fee percentages and structures at issue were established years ago, at a time

when the quality of the services performed for the Scudder Funds was much higher. Subsequent

to the acquisition of Scudder by Defendant Deutsche Bank AG ("Deutsche Bank") in 2002,

however, services dramatically deteriorated. Many well-qualified managers and other employees

1

left, and as a result various of the Funds sustained a diminution in asset value. However, the applicable fee percentages were not reduced to reflect the deterioration in the quality of the services performed. Indeed, in certain instances the management fee percentages actually increased.

3.     Instead of focusing on fixing the problems afflicting the Scudder Funds, Defendants chose to focus on increasing sales of their deteriorating product for their own benefit. Defendants wrongfully charged the Scudder Funds and their investors management fees that were excessive because they were calculated in a manner designed to enable the Investment Adviser Defendants (defined below) to cover the cost of "revenue sharing" payments to brokers out of the management fee while still making their full profit after those payments. The "revenue sharing" payments were made to brokers to induce them to promote sales of Scudder Fund shares over sales of interests in competing funds. Defendants' conduct in this regard was calculated to benefit themselves rather than the Funds, because an increase in fund assets would result in an increase in the dollar amount of management and distribution fees, which were calculated as a percentage of the Funds' assets. The revenue sharing payments provided no benefit to the Funds or their Investors.

4.     Defendants engaged in revenue sharing programs in an effort to generate increased compensation for themselves even though many of these practices were in violation of SEC and NASD rules and regulations. Furthermore, they engaged in such unlawful activity despite ample evidence that the increase in their compensation resulting from additional sales was not justified by any increase in the quality or nature of the services which they provided to the Funds.

5.      Although certain of the Funds declined in assets after Deutsche Bank acquired Scudder, Defendants succeeded in expanding the aggregate assets of the Scudder Funds in recent years through their use of Fund assets to promote the sale of Fund shares – expenses that should have been borne by Defendants, rather than the Funds themselves.

6.      In addition, Fund assets were used to pay large amounts of "Rule 12b-1" fees to the Distributor Defendant (defined below) without any benefit accruing to the Funds or their investors from those payments. Defendants also inflated their management fees by other uses of Fund assets for their own benefit. For example, they caused the Funds to make "Soft Dollar" commission payments to brokers, through which brokers were paid commissions at a rate that exceeded the normal rate for effectuating portfolio transactions in return for services that would normally be provided by the adviser. Soft Dollar commissions were utilized by Defendants to shift significant expenses from the investment advisers to the Funds without any corresponding offset in the level of the management fee.

7.      The fee structure imposed by Defendants on the Funds and their shareholders far exceeded the fees that would be paid as a result of arm's-length bargaining. Fees for essentially the same services that were paid by similar funds not affiliated with Defendants were substantially less.

8.      The aggregate of net assets in the Scudder family of funds now substantially exceeds the assets in place when the current fee structures were imposed. Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to investors. Instead, they created and utilized the economies of scale exclusively for their own benefit.

3

9.      The Trustees of the Scudder Funds were appointed in order to serve as "watch dogs" having the responsibility to assure that fees received by the Investment Adviser and Distributor Defendants were reasonable.  In violation of those duties, the Trustees repeatedly approved compensation and fee programs that provided many millions of dollars of payments to the Investment Adviser and Distributor Defendants despite red flags that should have alerted them to the fact that the services being provided to the Funds did not justify such fees, that services were deteriorating while the management fee structure stayed the same or went up, and that no meaningful benefits were provided to the Funds in return for major categories of fees. The Trustees failed to conduct meaningful arm's-length bargaining on behalf of the Funds in negotiating the amount of the adviser's fees, the Rule 12b-1 payments, and the other categories of payments at issue herein.

10.     As a result of all these events, and in the absence of effective watchdogs, which were supposed to be the Trustees, Defendants profited handsomely at the expense of investors' interests.  As a result, Plaintiffs and the Class have suffered damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 36(b) and 48(a) of the Investment Company Act, 15 U.S.C. §§80a-35(b) and 80a-47(a).

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §80a-43.

13.     Many of the acts charged herein, including the charging and receipt of excessive fees, occurred in substantial part in this District. Defendants conducted other substantial business within this District and many Class members reside within this District.  The United States

4

corporate headquarters of Defendant Deutsche Bank were at all relevant times, and still are, located in this District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

15.     Plaintiff Aaron Walker held at the commencement of this action and continues to hold shares or units of the Scudder Blue Chip Class A Fund and has been damaged by the conduct alleged herein.

16.     Plaintiff IRA FBO Louis P. Mazza held at the commencement of this action and continues to hold shares or units of the Scudder Preservation Plus Income Fund[1] and has been damaged by the conduct alleged herein.

17.     Plaintiffs Michael and Nancy Icardo held at the commencement of this action and continue to hold shares or units of the Scudder Total Return Fund and have been damaged by the conduct alleged herein.

### Parent Company

18.     Defendant Deutsche Bank is a Germany-based financial services firm providing asset management, mutual fund, retail, private and commercial banking, investment banking and insurance services. Deutsche Bank is the ultimate parent of the Defendants bearing the Deutsche

---

[1]   Scudder Preservation Plus Income Fund was renamed Scudder Limited-Duration Plus Fund on June 1, 2005.

and Scudder name herein and conducts its asset management activities in the United States under

the marketing name "Deutsche Asset Management." Deutsche Asset Management is a global

asset management organization and is also the marketing name for the asset management

activities of Deutsche Investment Management Americas, Inc. ("Deutsche Investment

Management"), Deutsche Asset Management, Inc., Deutsche Asset Management Investment

Services Ltd., Deutsche Bank Trust Company Americas, Scudder Investments and Scudder Trust

Company. Deutsche Bank maintains its United States corporate headquarters at 60 Wall Street,

New York, New York 10005.

**Investment Advisers**

19.     Defendant Scudder Investments was registered as an investment adviser under the

Investment Advisers Act and acted as investment adviser, along with Deutsche Asset

Management, Inc., and Deutsche Investment Management, to the Scudder Funds during the

relevant period. It is the United States retail mutual fund operation of Deutsche Asset

Management, Inc. Through Deutsche Asset Management, Inc., Scudder Investments offers a

research organization that includes portfolio managers and analysts, and management of over 95

mutual funds, including the Scudder Funds. Scudder Investments maintains its headquarters at

222 South Riverside Plaza, Chicago, Illinois 60606.

20.     Defendant Deutsche Investment Management was registered as an investment

adviser under the Investment Advisers Act and acted as investment adviser, along with Deutsche

Asset Management, Inc., and Scudder Investments, to the Scudder Funds during the relevant

period. Deutsche Investment Management, along with Deutsche Asset Management, Inc., and

Scudder Investments, had ultimate responsibility for overseeing the day-to-day management of

6

the Scudder Funds. Deutsche Investment Management is a wholly-owned subsidiary of

Deutsche Bank, and is located at 345 Park Avenue, New York, NY 10154.

21.     Defendant Deutsche Asset Management, Inc. was registered as an investment

adviser under the Investment Advisers Act and acted as investment adviser, along with Deutsche

Investment Management, and Scudder Investments, to the Scudder Funds during the relevant

period. Deutsche Asset Management, Inc., along with Deutsche Investment Management, and

Scudder Investments, had ultimate responsibility for overseeing the day-to-day management of

the Scudder Funds. Deutsche Asset Management, Inc. is located at 280 Park Avenue, New

York, NY 10017.

22.     Scudder Investments, Deutsche Asset Management, Inc., and Deutsche

Investment Management are herein collectively known as the "Investment Adviser Defendants."

**Distributor**

23.     Scudder Distributors, Inc. ("Scudder Distributors" or the "Distributor

Defendant"), an affiliate of Deutsche Asset Management, Inc., acts as the principal underwriter

and distributor of shares of most of Scudder Investments' U.S.-registered open-end mutual

funds.

**SUBSTANTIVE ALLEGATIONS**

**DEFENDANTS BREACHED THEIR DUTIES BY CHARGING
EXCESSIVE FEES**

24.     The fees charged to mutual funds and their investors must be within the range of

fees that would have been the result of arm's-length bargaining. Investment advisers and their

affiliates owe a fiduciary duty to the mutual funds they service, and the security holders of those

funds, to charge a fee that is not excessive.

7

**The Excessive Fees At Issue**

25.      **Investment Advisory Fees**:  Investment advisory fees are calculated as a percentage of assets under management.  Investment advisory fees are paid to investment advisers for managing the underlying portfolio, *i.e.,* choosing the securities in which a mutual fund should invest. As the fund assets increase, the dollar amount of such fees parallels this growth.

26.      **Rule 12b-1 Fees**:  SEC Rule 12b-1 permits a fund to pay "12b-1" distribution fees out of fund assets only if the fund has adopted a 12b-1 plan authorizing their payment, and only if the Trustees properly find that there is a reasonable likelihood that the plan will benefit the Fund and its shareholders.  Distribution fees include fees paid for marketing and selling fund shares, such as compensation for brokers and others who sell fund shares, and payments for advertising, the printing and mailing of prospectuses to new investors and the printing and mailing of sales literature.

27.      **Service Fees and Administrative Fees:**  Service and administrative fees are fees paid to persons to respond to investor inquiries and provide investors with information about their investments.  These fees pay for similar expenses or largely overlap, as described more fully below.  Unlike distribution fees, a fund may pay shareholder service and administrative fees without adopting a 12b-1 plan.

28.      An investment adviser's main sources of revenue are investment adviser, administration, distribution and service fees.  In the absence of effective "watchdogs" (*i.e.,* the Trustees) and given the Funds' opaque fee structures, the Investment Adviser Defendants and Distributor Defendant were able to take advantage of various forms of fees and Fund assets

8

under their control.  Specifically, Defendants charged excessive investment advisory fees, administrative fees, 12b-1 fees, and service fees.

**Factors That Show the Fees Charged to the Scudder Funds and their Investors are not Reasonably Related to the Services Provided Them**

29.    The mutual fund industry recognizes that certain factors indicate that fees are excessive.  In particular, the following factors illustrate whether a fund is charging excessive fees to the funds and their investors:

- the quality of services provided to the fund;

- the nature of services being paid for by the fund;

- whether the investment advisory fees are reduced to reflect the fall out benefits the advisers receive;

- what other fund families charge for similar mutual funds;

- whether economies of scale were passed to the funds and their investors or kept by the investment adviser; and

- whether the trustees were adequately informed and properly approved the investment advisory agreement.

30.    When examining Scudder's mutual funds, all these factors prove that Defendants were taking advantage of the fees and charging excessive amounts to benefit themselves.

**The Fees Were Excessive in Relation to the Quality and Nature of The Services Being Provided**

31.    Prior to Deutsche Bank's acquisition of Scudder in 2002, investors purchased Scudder Funds based on the brand's reputation for providing quality services.  However, after that acquisition, the Scudder brand remained in place, but the quality of services provided to

Scudder's investors rapidly deteriorated while management fees remained the same or increased.

According to Morningstar:

> Scudder's current lineup is the product of the 2002 merger of
> Deutsche (which folded in its Deutsche, Flag and Morgan Grenfell
> funds) and Scudder (which had merged in 1997 with Kemper
> Financial Services). . . What's more, the mergers led to culture
> clashes and considerable portfolio-manager turnover.  Many funds
> are now helmed by skippers who lack experience running money
> in accordance with their charges' particular style.

32.    Since the acquisition, Scudder has experienced an outflow of $35 billion in assets

because of the perception that the company is poorly managed.  Brett Arends, *Deutsche Bank Set*

*to Sink Famous Hub Fund Firm*, Boston Herald, November 29, 2005.

33.    The decrease in quality is also apparent by the decrease in performance of the

Scudder Funds.  As was noted recently in an article:

> Overall performance [of Scudder Funds] lags the competition,
> according to Morningstar's rankings.  For the period after the
> merger until the present – May 1, 2002 through May 31, 2004, the
> total complex of 308 Scudder Funds was up an annualized 4.95%,
> compared with the total complex of Fidelity Investments' 387
> funds, which was up an annualized 5.89% in the same period and
> Vanguard Group's 159 funds, up an annualized 6.24% in the
> period.

*Merger tales: Slowed, but not stopped; Exodus continuing at Deutsche Asset*

*Management, 2 years after its acquisition of Scudder Investments*, Pensions and

Investments, June 14, 2004.

34.    This decrease in performance was due at least in part to the exodus of highly

trained, experienced and well-respected managers.  The list of departing employees included but

was not limited to:

- William Holzer, who headed a highly regarded Scudder global equity
  team that departed with him to Lazard Asset Management, New York,

along with an estimated $2 billion in assets.  Members of the Holzer team – Nicholas Bratt, Andew Norris and Irene Chang – also left and reunited at Lazard.

- David Baldt, a star Deutsche Asset Management fixed-income manager who went to Schroder Investment Management, New York, where he manages the municipal bond team.

- Joshua Feuerman, former Deutsche head of quantitative equities, who left to start a hedge fund, BTN Partners, in Greenwich, Connecticut.

- Jeffrey Ullness, co-head of Deutsche Asset Management's financial institutions group, who was recruited by another firm.

- Larry Abele, managing director of quantitative strategies, who left to form his own hedge fund company.

35.    The same article also quoted former senior Deutsche executives, who asked not to be identified, who said the departures are continuing and that they hear regularly from people who are still at the firm that they would leave "in a heartbeat" for the right job. *Merger tales: Slowed, but not stopped; Exodus continuing at Deutsche Asset Management, 2 years after its acquisition of Scudder Investments*, Pensions and Investments, June 14, 2004.

36.    According to a headhunter, "I have never seen such a mass exodus.  They lost a lot of their star managers and many talented marketers and client service people to other people." *Merger tales: Slowed, but not stopped; Exodus continuing at Deutsche Asset Management, 2 years after its acquisition of Scudder Investments*, Pensions and Investments, June 14, 2004.

37.    At the same time, the percentage of investment advisory fees charged to the Funds remained the same or increased while the quality and nature of services deteriorated.  For example, the investment advisory fee for the Scudder Total Return Fund, whose lead manager changed on November 23, 2004, increased from .53 in 2001 to .54 in 2003.

38.    Similarly, the advisory fee for the Scudder Blue Chip Fund, whose lead manager changed on May 16, 2003, increased from .55 in 2001 to its current level of .56.  The lack of a

11

reasonable relationship between the advisory fees and advisory services provided is noted by

Morningstar with respect to such funds as Scudder Blue Chip Fund.  According to a Scudder

Blue Chip analyst report:

> ...the fund's costs present a hurdle that will be difficult to
> overcome on a long-term basis.  Although the fund's 1.19%
> expense ratio is roughly equal to that of the typical broker-sold
> large-blend offering it's too pricey for a quantitatively managed,
> index-focused fund.  We think investors should seek out cheaper,
> more-proven options.

Greg Carlson, Although Scudder Blue Chip's management team has done a solid job recently,

high expenses and lingering ethical issues negate its appeal, Morningstar's Take (Dec. 1, 2004),

at http://quicktake.morningstar.com/Fund/MorningstarAnalysis.asp?Country=USA&Symbol

=KBCAX.

39.     Similar comments about the lack of relationship between the advisory services

provided and fees charged is also noted with respect to Scudder Dreman Financial Services

Fund.  According to Morningstar's analyst report:

> ...given Dreman's benchmark-focused strategy, there's little
> reason to pay the fund's 1.36% expense ratio.

Greg Carlson, We See No Reason to own Scudder Dreman Financial Services Fund,

Morningstar's Take (May 29, 2005). http://quicktake.morningstar.com/

Fund/MorningstarAnalysis.asp?Country=USA&Symbol=KDFAX.

**In Response to Their Business Problems, The
Investment Adviser Defendants Sought To
Strengthen Their Revenue Sharing Relationships**

40.     Following the significant redemptions that occurred after the acquisition, Scudder

increased its focus on the distribution and sale of fund shares.  Specifically, the Investment

Adviser Defendants focused on developing their revenue sharing relationships with broker-

dealers. Revenue sharing occurs when the investment adviser or its affiliate makes payments to a broker-dealer or other institution in exchange for the institutions' pushing shares of the investment adviser's funds.

41.     Revenue sharing arrangements are very appealing to investment advisers because they can increase sales from three to ten fold. *Revenue Sharing Boosts Mutual Fund Sales Tenfold*, Money Management Executive, 2005. At the same time, revenue sharing arrangements are very expensive for investors because their high costs translate into higher and excessive fees.

42.     The importance placed by Defendants on Scudder's relationship with broker-dealers and other institutions through which Scudder Fund shares are sold was described in a power point presentation that was given by Tom Hughes, Head of Deutsche Asset Management, at the Deutsche Bank Investor Day, September 30, 2003. The power point states that Scudder needs a "Focused approach to develop deep relationships at top tier firms and intermediary focus on wire-houses, financial advisor, and bank channels." The presentation then focused on the following companies and how Scudder ranked with them:

| WIREHOUSES | Rank as of June 30, 2003 | Rank as of June 30, 2002 |
|---|---|---|
| Deutsche Bank | 1 | 7 |
| Morgan Stanley | 8 | 12 |
| Merill Lynch | 21 | 33 |

13

| FINANCIAL ADVISORS | Rank as of June 30, 2003 | Rank as of June 30, 2002 |
|---|---|---|
| H.D. Vest | 2 | 4 |
| Linsco/Private Ledger Financial Services | 4 | 9 |
| Raymond James Financial Services | 7 | 18 |

| BANKS | Rank as of June, 30 2003 | Rank as of June 30, 2002 |
|---|---|---|
| WM Financial | 10 | 10 |
| Citicorp | 11 | 17 |
| Wachovia Securities Inc. | 17 | 16 |

43.     These overall increased rankings illustrate that Scudder's "focused approach" on further developing its distribution relationships with institutions through revenue sharing was successful.  However, since the date of this presentation, four of the nine companies named have been fined by regulators for accepting payments from some mutual fund companies in exchange for pushing these Funds over other mutual fund families.

44.     As noted by Deutsche Bank's annual report, Scudder's relationship with these companies was beneficial to Deutsche Bank.  According to Deutsche Bank's 2003 Annual Report:

> As a result of focusing on distribution in the adviser-sold channel, Scudder enjoyed strong sales growth in 2003.  According to the Investment Company Institute (ICI), our long-term new sales increased 14% from U.S. $5.6 billion in 2002 to U.S. $6.4 billion in 2003.

45.     In order for the Investment Adviser Defendants to be able to pay significant remuneration to such companies for the promotion of Scudder shares, they charged excessive fees to the shareholders that were not related to services provided, as described more fully below.

**The Investment Adviser Defendants Placed the Expense
of Revenue Sharing Payments on Scudder's Investors and Funds**

46.     The Investment Adviser Defendants charged excessive fees to investors by charging the Funds for the Investment Adviser Defendants out-of-pocket revenue sharing expenses. Such expenses should not be taken into consideration in determining the advisory fees. A recent report on revenue sharing by Cerulli Associates notes that management fees are the most significant source of revenue sharing. According to a former Scudder employee, who worked in marketing during the relevant period, certain marketing and promotional fees were paid out of the management fee charged to the Funds. The management fee was inflated to pay for these expenses and, according to the former employee, such marketing and promotion charges could annually represent about $50 million worth of expenditures.

47.     Investment advisory fees are meant to cover management of investment funds. This includes portfolio management of the fund and sometimes non-advisory services such as administrative matters. *Report of the SEC on the Public Policy Implications of the Investment Company Growth*, H.R. Rep. No. 8902337.

48.     However, the investment advisory fees used for revenue sharing do not fit either of these categories. Revenue sharing expenses are not supposed to be borne by investors and their funds as they are not management or traditional advisory expenses. The Investment Adviser Defendants took into account the amount of the revenue sharing they would pay to broker-dealers and others in determining the amount they would charge for their management fees, in order to make sure that they would earn their full profit <u>after</u> the revenue sharing

15

payments were made. The revenue sharing payments may benefit the Investment Adviser Defendants, but do not benefit Funds or their shareholders.

49.     The SEC has condemned these practices, stating that, "[r]evenue sharing arrangements not only pose potential conflicts of interest, but also may have the indirect effect of reducing investors' returns by increasing the distribution-related costs incurred by funds. Even though revenue sharing is paid to broker-dealers directly by fund investment advisers, rather than out of fund assets, it is possible that some advisers may seek to increase the advisory fees that they charge the fund to finance those distribution activities... Moreover, revenue sharing arrangements may prevent some advisers from reducing their current advisory fees." 69 Fed. Reg. 6438, 6411 n. 21 (Feb. 10, 2004).

50.     The nature of Scudder's revenue sharing program was such that it strongly incentivized broker-dealers to expand their marketing efforts on behalf of the Scudder Funds. For example, the Investment Adviser Defendants paid broker-dealers like Linsco/Private Ledger and H.D. Vest for the benefit of having increased access to their sales force, including participation in top producer meetings, training events and telephone calls to the sales force; having their funds identified as participants in the programs on internal websites; placing content in internal communications; and the ability to present written materials to the sales force.

51.     Furthermore, Defendants steered their employees into working with the broker-dealers that would sell Scudder Funds over other families of funds. According to a former regional sales representative, the main wirehouse channels were Morgan Stanley, Merrill Lynch and Wachovia. Furthermore, the former representative also noted that during the relevant period, "[w]e were incentivized to work with specific companies. Our commissions were paid out higher if I worked with a specific company and specific products."

16

52.     As a result of such activities, the aggregate net assets - against which the management fees were charged on a percentage basis – increased, with a consequent increase in the dollar amount of the advisory fees.  The Investment Adviser Defendants therefore received "something for nothing" from the Funds and their shareholders because it was not the result of any increase or improvement in the services being provided, and did not reflect any legitimate increase in the cost of the services being provided the advisors and their affiliates.

53.     As such, Defendants engaged in revenue sharing and charged the Funds and their investors excessive fees in order to enhance their own management fees, despite the fact that such programs were conducted in a way that violated SEC and NASD rules.

**Defendants Used Excessive Advisory Fees to Circumvent
the Requirements of 12b-1 on Use of Fund Assets for Distribution**

54.     As alleged above, the Investment Adviser Defendants, through excessive advisory fees, were using fund assets to finance their revenue sharing arrangements.  Investment advisory fees paid to an investment adviser with the intent of allocating a certain amount towards distribution practices, such as revenue sharing, where the investment adviser and its affiliates claim to make payments from their own profits, are regulated under Rule 12b-1 and Section 36(b).  As the SEC explained, "Rule 12b-1 could apply . . . in certain cases in which the adviser makes distribution related payments out of its own resources.... 'if *any allowance* were made in the investment adviser's fee to provide money to finance distribution.'"  *Investment Company Act of 1940 Rule 12b-1*, 1998 SEC No-Act. Lexis 976, at *16 (citing *Payment of Asset-Based Sales Loads By Registered Open-Ended Management Investment Companies*, Investment Company Act Release No. 16431, 1988 SEC LEXIS 1206 (June 13, 1988)) (emphasis added).  Defendants paid for part of these revenue sharing arrangements through advisory fees to circumvent the limits placed on the use of Fund assets for distribution under 12b-1.

17

**Defendants Received Substantial 12b-1 Fees But**
**Provided No Benefit to the Scudder Funds in Return**

55.    Rule 12b-1, promulgated by the SEC under Section 12(b) of the Investment

Company Act, prohibits mutual funds from directly or indirectly distributing or marketing their

own shares unless certain enumerated conditions set forth in Rule 12b-1 are met.  The Rule 12b-

1 conditions, among others, are that payments for marketing must be made pursuant to a written

plan "describing all material aspects of the proposed financing of distribution;" all agreements

with any person relating to implementation of the plan must be in writing; the plan must be

approved by a vote of the majority of the board of Directors; and the board of Directors must

review, at least quarterly, "a written report of the amounts so expended and the purposes for

which such expenditures were made."  Additionally, fund Directors "have a duty to request and

evaluate, and any person who is a party to any agreement with such company relating to such

plan shall have a duty to furnish, such information as may reasonably be necessary to an

informed determination of whether the plan should be implemented or continued."  The

Directors may continue the plan "only if the board of Directors who vote to approve such

implementation or continuation conclude, in the exercise of reasonable business judgment, and in

light of their fiduciary duties under state law and section 36(a) and (b) [15 U.S.C. 80a-35(a) and

(b)] of the Act that *there is a reasonable likelihood that the plan will benefit the company and*

*its shareholders."* [Emphasis added.]

56.    The Rule 12b-1 exceptions to the Section 12(b) prohibition on mutual fund

marketing were enacted in 1980 under the theory that the marketing of mutual funds, all things

being equal, should be encouraged because increased investment in mutual funds would

presumably result in economies of scale, the benefits of which would be shifted from fund

managers to investors.

18

57.     During the relevant period, the Investment Adviser Defendants collected millions

of dollars in purported Rule 12b-1 marketing and distribution fees.  However, the purported Rule

12b-1 fees charged to Scudder Funds investors were both excessive and unlawful because the

conditions of Rule 12b-1 were not met.  There was no "reasonable likelihood" that the plan

would benefit the company and its shareholders.  To the extent the Funds increased the assets

through the sale of additional shares, Defendants failed to pass along to those Funds and their

investors any benefits from any economies of scale.  Furthermore, the purported effort to

improve the Funds through marketing additional shares essentially threw good money after bad

because Defendants were not addressing the real problem, which was the need to improve the

quality of the Funds' management.

58.     Moreover, at least four classes of Scudder Funds were closed to new investors

(the "Closed Funds") and, consequently, the so-called 12b-1 fees could not possibly have been

used to market and distribute them.  Nevertheless, the Investment Adviser Defendants received

Rule 12b-1 fees charged to the Closed Funds.  The Closed Funds that charged such Rule 12b-1

fees are: Scudder Cash Reserve Prime A, B and C and Scudder Target 2013 Fund.

**The Investment Adviser Defendants Failed to Reduce Their Fees to Reflect the Benefits
They Received By Shifting Their Expenses to the Funds through Soft Dollar Commissions**

59.     Under prevailing law, investment advisers are under a duty to obtain best

execution for the underlying portfolio trades of their funds.  However, funds are allowed to pay

brokerage commission amounts that exceed "best execution" costs in order to obtain certain

additional services, which the SEC has defined to include any service that "provides lawful and

appropriate assistance to the money manager in performance of his investment decision-making

responsibilities."  15 U.S.C. §78bb interpretive notes and decisions, at 7.  The commission

amounts charged by brokerages for selling the underlying securities in a mutual fund that are in

excess of the purchase and sale charges are known within the industry as "Soft Dollars." The

Soft Dollar component of such commission payments is typically paid to obtain for the fund

services or products that are traditionally provided to the fund by the investment adviser out of

its own resources, such as investment research. By paying for such services out of Fund assets

through Soft Dollar commissions, the Investment Adviser Defendants shifted to the Funds

substantial expenses that the adviser would otherwise have borne. However, they failed to

reduce their advisory fee by an amount that compensated the Funds for the fact that the Funds

were now paying expenses that are normally borne by the advisers. The advisory fees were

therefore excessive to the extent that they were not adjusted down to compensate the Funds and

their investors for bearing such additional costs.

**The Investment Adviser Defendants Failed to Reduce Their Fees to Reflect**
**The Fall Out Benefits They Received By Using Fund Assets to**
**Generate Increased Dollar Amounts of Management Fee**

60.     The Investment Adviser Defendants and Distributor Defendant used Fund assets,

such as excessive 12b-1 payments and brokerage commissions, to compensate broker-dealers

who steered their clients into Scudder Funds as part of the *quid pro quo* arrangements between

Scudder and various brokerages. As a result they used funds assets to obtain benefits, which

"but for" their relationship with their funds they would not receive. In turn, the increased sales

of Fund shares that resulted from these activities gave rise to an enlarged dollar amount of

management fees to the Investment Adviser Defendants and expanded distribution payments to

the Distributor Defendant. In light of the increase in fees to these Defendants that resulted from

the use of fund assets to pay revenue sharing, directed brokerage, and Soft Dollar payments,

Defendants have received substantial "fallout" benefits from their relationship with Fund

shareholders, which also constitutes a portion of Defendants' excessive fees.

61.    The unlawful benefits received by Investment Adviser Defendants became more

apparent on June 8, 2005, when the NASD fined 14 brokerage firms a total of $30 million for

directed brokerage violations, where they accepted directed brokerage to satisfy revenue sharing

arrangements.  According to the NASD press release:

> The mutual fund complexes that participated in these programs
> paid extra fees for enhanced visibility.  The additional fees were
> typically based on a combination of sales and/or assets under
> management by the brokerage firm.
>
> *        *        *
>
> The retail firms generally monitored the amount of directed
> brokerage received to ensure that the fund complexes were
> satisfying their revenue sharing obligations.  The use of directed
> brokerage allowed the fund complexes to use assets of the mutual
> funds instead of their own money to meet their revenue sharing
> obligations.

*See* NASD Charges 15 Firms with Directed Brokerage Violations, Imposes Fines Totaling More

than $34 Million (June 8, 2005).[2]

62.    Of the broker-dealers fined, Scudder has been implicated as a participant in

revenue sharing agreements by subsequent website disclosures with Linsco/Private Ledger, H.D.

Vest, Morgan  Stanley, SunAmerica, Sentra Securities Corporation, Spelman & Co., Inc., FSC

Securities Corp., Securities America, Inc., and RBC Dain Rauscher, Inc.

---

[2]  The following firms were fined: Royal Alliance Associates, Inc, H.D. Vest Investment
Services, McDonald Investments Inc., AllianceBernstein Investment Research and Management,
Inc., RBC Dain Rauscher, Inc., Securities America, Inc.,  FSC Securities Corp., Advest, Inc.,
Sentra Securities Corporation, Spelman & Co., Inc., AXA Advisors, LLC Wells Fargo
Investments, LLC Advantage Capital Corp., SunAmerica Securities, Inc., and Linsco/Private
Ledger Corp.

**The Fees Charged to the Funds and their Investors Were**
**Excessive Relative To Similar Funds Offered in The Industry**

63.     When examining the expense ratios of other families of funds that provide the

same types of funds as Scudder, it is apparent that Scudder charges higher fees than other

investment advisers who manage the same type of portfolio. For example, Scudder's large blend

funds, such as Scudder Blue Chip A Fund with a 1.13% expense ratio, have a higher expense

ratio than large blend funds in other families of funds that are considered similar.[3]

| LARGE BLEND FUNDS RECOMMENDED BY MORNINGSTAR | EXPENSE RATIOS |
|---|---|
| Selected American Shares | .92% |
| Vanguard 500 Index | .18% |
| Vanguard PRIMECAP | .46% |

| LARGE BLEND FUNDS THAT MORNINGSTAR FOUND MOST SIMILAR TO SCUDDER | EXPENSE RATIOS |
|---|---|
| Gartmore Nationwide | .82% |
| Pioneer A | 1.06% |

---

[3] Large blend funds are a category of funds that are mostly comprised of large cap stocks mixed with growth and value stocks.

64.     Scudder's moderate allocation funds, such as Scudder Total Return Fund with a

1.03% expense ratio, also have higher expense ratios than similar funds recommended by

Morningstar.[4]

| MODERATE ALLOCATION FUNDS RECOMMENDED BY MORNINGSTAR | EXPENSE RATIOS |
|---|---|
| Dodge & Cox Balanced | .54% |
| Pax World Balanced | .95% |

| MODERATE ALLOCATION FUNDS THAT MORNINGSTAR FOUND MOST SIMILAR TO SCUDDER | EXPENSE RATIOS |
|---|---|
| T. Rowe Price Balanced | .71% |

65.     Scudder's short-term bond funds, such as Scudder Limited-Duration Fund with a

1% expense ratio, have higher expense ratios than similar short-term bond funds that are

recommended and found to be similar by Morningstar.

| SHORT TERM BOND FUNDS RECOMMENDED BY MORNINGSTAR | EXPENSE RATIOS |
|---|---|
| Vanguard Short-Term Bond Index | .18% |

---

[4] Moderate allocation funds are a category of funds which have investments in over 50% equity and the rest in fixed income.

23

| SHORT TERM BOND FUNDS THAT MORNINGSTAR FOUND MOST SIMILAR TO SCUDDER | EXPENSE RATIOS |
|---|---|
| First American Short Term | .75% |
| USAA Short Term Bond | .56% |
| Vanguard Short Term Investment | .18% |
| WM Short Term IncomeA | .83% |

66.     As demonstrated by the foregoing charts, the fact that Scudder charges higher fees

than other comparable funds is yet a further indicator of the excessiveness of the fees at issue

here.

**Excessiveness Is Also Shown By Comparing The Fees
at Issue to Fee Arrangements In Which Both Parties
Have The Ability To Negotiate at Arm's-Length**

67.     Fees that were the result of arm's-length negotiations with institutional investors

were significantly lower than fees charged to individual retail investors for the same services.

The SEC recently noted its concern over such fee discrepancies when proposing a rule requiring

further disclosure of Directors' bases for approving or renewing an advisory contract:

> Recently, concerns have been raised regarding the adequacy of
> review of advisory contracts and management fees by fund boards.
> In particular, the level of fees charged by investment advisers to
> mutual fund clients, especially in comparison to those charged by
> the same advisers to pension plans and other institutional clients,
> has come under scrutiny.

Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment

Companies, Release Nos. 33-8364, 34-49219, IC-26350, 2004 SEC LEXIS 298, at *8 (proposed

Feb. 11, 2004)(to be codified at 17 C.F.R. pt. 239, 240, and 274).

24

68.     Scudder distribution fees are significantly higher for retail investors than for institutional investors for similar services.  As a result, the overall expense ratio is higher for the retail shares than for the institutional shares.  For example, compare the expense ratios of the following funds retail Class A shares with the expense ratios of institutional shares of the same fund:

| Mutual Funds | Retail Class A Shares | Institutional Shares |
|---|---|---|
| Scudder Blue Chip | 1.13% | .74% |
| Scudder Total Return | 1.03% | .69% |
| Scudder Limited Duration Plus | 1.45% | 1.00% |

69.     As indicated by the SEC's concerns described above, this substantially higher expense ratio for non-institutional funds is not justified by any difference in the costs of administering the accounts of institutional investors, as opposed to retail investors.  This discrepancy is therefore another indicator of the excessiveness of the fees at issue herein.

**The Economies of Scale Were Not Passed to Investors**

70.     The profitability of an investment adviser is a function of revenue minus the costs of providing services.  Defendants' incremental costs of providing advisory services to the Funds were nominal.  The additional fees received by Defendants were disproportionate given that the nature, quality and level of services remained the same.  On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred.  For example, many of the costs, such as the costs of research for a particular investment, remain fixed regardless of the amount of assets in a given fund devoted to that investment.  As has been noted, the mutual fund industry is

25

a business in which economies of scale are present and are statistically significant. *See* Jim

Saxton, Chairman, Joint Economic Committee, United States Congress, The Mutual Fund

Industry: An Overview and Analysis February 2002 (citing William Baumol, The Economics of

Mutual Fund Markets: Competition Versus Regulation, 186, 190, Boston: Kluwer Academic

(1990)).

71.    The growth of assets under management  by Scudder has also generated

substantial economies of scale to the great benefit of the Investment Adviser and Distributor

Defendants, which have not been passed on to the Funds and their investors through lower fees,

resulting in greatly increased expenses.

72.    The Investment Adviser Defendants and Distributor Defendant, in charging fees

to the Funds, failed to pass on the economies of scale they were realizing as the Funds grew.  For

example, despite the fact that assets of the Scudder Growth and Income Fund (Class A shares)

increased from 23 to 32 million dollars from 2000 to 2003, the net asset value ("NAV") per share

of the fund fell from $26.86 in 2000 to $18.04 in 2003.  Yet during the same period, expenses

charged by Defendants increased, with the ratio of expenses jumping from 1.02% in 2000 to

1.12% in 2003.  The Directors of the Funds ignored this red flag and allowed the Investment

Adviser and Distributor Defendants to continue to charge the Funds excessive fees.  As the SEC

has made clear, "if the fund or fund family is experiencing economies of scale, fund Directors

have an obligation to ensure that fund shareholders share in the benefits of the reduced costs by,

for example, requiring that the adviser's fees be lowered, breakpoints be included in the adviser's

fees, or that the adviser provide additional services under the advisory contract... If the fund or

fund family is not experiencing economies of scale, then the Directors may seek to determine

from the adviser how the adviser might operate more efficiently in order to produce economies

26

of scale as fund assets grow." SEC, Division of Investment Management: Report on Mutual

Fund Fees and Expenses, at B1 (Dec. 2000) ("SEC Report on Mutual Fund Fees"), *available at*

http://www.sec.gov/news/studies/feestudy.htm.

73.     As noted by Morningstar, "expenses are on the rise for many funds, even though

their assets have also increased." Scudder Blue Chip A (KBCAX) Analyst Report, Greg

Carlson, October 1, 2004.  For example, in 1989, Scudder had $15.3 billion net assets under

management, which increased to $55.6 billion by 2004.  However, the expense ratio had

increased dramatically from .73 in 1989 to 1.03 in 2004.  Paul B. Farrell, *Are Fund Expenses Too*

*High?*  MARKETWATCH, July 31, 2005.  Not only has there been a significant increase in these

fees charged to Scudder investors, but Scudder's fees, similar to other expensive fund families,

are anywhere from two to five times higher than the fund family with the lowest expenses.  Paul

B. Farrell, *Are Fund Expenses Too High?*  MARKETWATCH, July 31, 2005.

74.     According to a former employee who was involved in a Scudder program during

the relevant period that was aimed at reducing shareholder expenses, "I think I got fired for it."

He stated that his efforts had resulted in a savings of $14 million in advisory fees in one year,

which were used to pay for advertising fees.  However, he found that in the end, investors were

still being charged the same amount and he did not understand where the money that was saved

had gone.  The former employee questioned where the savings were being redirected, but stated

that, "when I kept asking her where the money was, I got a little . . . too close to the sun, and the

wax was melted."

**The Service and Administrative Fees Charged To the Funds Were**
**Duplicative and Excessive Relative To The Services Provided**

75.     Significant economies of scale also exist with regard to the service and

administration fees charged to investors.  The cost of maintaining a shareholder's account is the

27

same for all shareholders, regardless of the size of his or her account. Suppose the annual cost of maintaining an account is $40 and that the mutual fund has 100,000 shareholders. If the fund has $100,000,000 in assets (an average of $1,000 per account), then the Scudder administrative expenses are 4.0% of fund assets. If total assets are $250,000,000 (an average account of $2,500), however, then the administrative expense ratio is 1.6% because the expense ratio falls as fund assets rise. *See* David A. Latzko, *Economies of Scale in Mutual Fund Administration*, Penn. St. Univ., JOURNAL OF FINANCIAL RESEARCH, Sept. 22, 1999. However, during the relevant period, administrative expenses increased even though assets under management also increased.

76.     Throughout 2003, the Investment Adviser Defendants provided administrative services for the Funds. However, they expressly adopted a policy of increasing the administrative fees they were charging and refused to pass on to the Funds and their shareholders the benefits obtained from the economies of scale. The Scudder Total Return Fund prospectus dated February 27, 2003, states that as of January 1, 2003 the Fund entered into new administrative arrangements under which it would not benefit from the economies of scale. The prospectus increased the basis points each class would pay and stated:

> One effect of this arrangement is to make each Fund's future expense ratio more predictable. However, the Funds will not benefit from economies of scale derived from increase in assets.

77.     The amounts paid in administrative fees by the Funds were significant. For example, according to the same prospectus, the following amounts were paid in administrative fees by the Scudder Total Return Fund and its investors between 2000 and 2002:

        2002    $6,596,452
        2001    $2,993,793
        2000    $3,826,613

28

78.     The SEC has demonstrated its concern regarding the industry's charging of

administrative fees by sending 50 firms requests for documents concerning such fees in April

2005. Beaugon Wilcox, *Board Caught up in SEC Sweeps on Fees, Brokerage*, BOARDIQ.COM,

May 3, 2005. In addition to not passing on economies of scale, the Funds and their investors pay

duplicative administrative fees to both the Investment Adviser Defendants and Distributor

Defendant. For example, the "Administrative Agreement" between Scudder Blue Chip Fund

and Scudder Investments, Inc., dated July 2001, states:

> Subject to the general supervision of the Board of Trustees of the
> Fund, the Administrator shall provide or procure all organizational,
> administrative and other services reasonably necessary for the
> operation of the Series and certain other services reasonably
> necessary for the operation of the Series and other services...

79.     At the same time, the Shareholder Services Agreements between Scudder Blue

Chip Fund and Scudder Distributors, dated July 2001, states:

> The Fund hereby appoints Scudder Distributors, Inc. (SDI) to
> provide information and administrative services for the benefit of
> the Fund and shareholders of Class A, Class B, and Class C shares
> of each series of the Fund.

Therefore, Scudder Blue Chip, for example, paid duplicate administration fees to both the

Investment Adviser Defendants and the Distributor Defendant.

80.     The Fee Schedule for the same Shareholder Services agreement states:

> ... the Fund and SDI agree that the administrative fee will be
> computed at an annual rate of .25 of 1% based upon the average
> daily net assets with respect to which a Firm other than SDI
> provides administrative services and .15 of 1% based upon the
> average daily net assets with respect to which SDI provides
> administrative services.

81.    These duplicative and excessive fees charged to Scudder Blue Chip Fund were

not isolated events.  Various other Funds, such as Scudder Gold & Precious Metal Funds, also

had duplicative fees.

82.    Furthermore, the .25% Scudder administrative fee charge is above the norm.  The

average administrative fee during 2003 was .1888% down from .19% in 2002.  *Start of Trend?*

*Admin Fees Start to Climb*, Boardiq.com, Sept. 2, 2003.

**The Trustees Lacked Independence, Failed to Conduct Meaningful
Arm's-Length Bargaining on Behalf of the Funds, and Approved the
Fees at Issue Despite Numerous Red Flags That the Fees Were Excessive**

83.    Scudder's Trustees failed to conduct arm's-length bargaining to protect the Funds

against excessive fees.  Scudder Funds public filings state that the Scudder Funds have boards of

trustees that are responsible for the management and supervision of each fund.  In this regard, the

Statement of Additional Information dated February 1, 2003 for the Scudder Growth and Income

Fund, which includes the Scudder Blue Chip Class A Fund, is typical of the Statements of

Additional Information available for other Scudder Funds.  It stated the following:

> The officers of the Trust manage the Fund's day-to-day operations
> under the direction of the Trust's Board of Trustees.  The primary
> responsibility of the Board is to represent the interests of the
> shareholders of the Fund and to provide oversight of the
> management of the Fund.

84.    Moreover, the Statement of Additional Information stated, with respect to the

duties of the directors and trustees vis-à-vis the funds' investment advisers, as follows:

> ***The Advisor manages each Fund's daily investment and business
> affairs subject to the policies established by each Trust's Board of
> Trustees.***  The Trustees of each Fund have overall responsibility for
> the management of each Fund...
>
> Pursuant to an investment management agreement with each
> Fund (each an "Agreement," and collectively, the Agreements"),
> the Advisor acts as each Fund's investment advisor,  manages its

30

> investments, administers its business affairs, furnishes office
> facilities and equipment, provides clerical and administrative
> services and permits its officers and employees to serve without
> compensation as trustees or officers of one or both funds if elected
> to such positions. To the extent permissible by law, the Advisor
> may appoint certain of its affiliates as sub-advisors to perform
> certain of the Advisor's duties.
>
> The principal source of the Advisor's income is professional fees
> received from providing continuous investment advice, and the
> firm derives no income from brokerage or underwriting of
> securities. Today it provides investment counsel for many
> individuals and institutions, including insurance companies,
> industrial corporations, and financial and banking organizations, as
> well as providing investment advice to open- and closed-end SEC
> registered funds.

[Emphasis added.] The directors or trustees of each fund are thus responsible for the review and
approval of the advisory and fee agreements between the investment advisers and the Scudder
Funds.

85.    The Investment Company Institute ("ICI"), of which Scudder Investments is a

member, recently described the duties of mutual fund boards as follows:

> More than 77 million Americans have chosen mutual funds to gain
> convenient access to a professionally managed and diversified
> portfolio of investments.
>
> Investors receive many other benefits by investing in mutual funds,
> including strong legal protections and full disclosure. In addition,
> shareholders gain an extra layer of protection because each mutual
> fund has a board of directors looking out for shareholders'
> interests.
>
> ***Unlike the directors of other corporations, mutual fund directors
> are responsible for protecting consumers, in this case, the funds'
> investors. The unique "watchdog" role, which does not exist in
> any other type of company in America, provides investors with
> the confidence of knowing the directors oversee the advisers who
> manage and service their investments.***
>
> ***In particular, under the Investment Company Act of 1940, the
> board of directors of a mutual fund is charged with looking after
> how the fund operates and overseeing matters where the interests
> of the fund and its shareholders differ from the interests of its
> investment adviser or management company.***

31

[Emphasis added.][5]

86.     Scudder Funds public filings state that the Scudder Funds have boards of Trustees

that are responsible for determining whether to approve or renew the advisory agreement.  In this

regard, the Statement of Additional Information dated February 1, 2003 for the Scudder Growth

and Income Fund, which includes the Scudder Blue Chip Class A Fund, is typical of the

Statements of Additional Information available for other Scudder Funds.  It states the following:

> *The Agreements … continue from year to year thereafter only if
> their continuance is approved annually by the vote of a majority
> of those Trustees who are not parties to such Agreements or
> interested persons of the Adviser or the Trust ("Independent
> Trustees" or "Non-interested Trustees"),* cast in person at a
> meeting called for the purpose of voting on such approval, and
> either by a vote of the Trusts' Trustees or of a majority of the
> outstanding voting securities of each Fund.

*     *     *

> *The factors considered by the Trustees included, among others,
> the nature, quality and extent of services provided by the
> Adviser to the Fund; investment performance, both of the Fund
> itself and relative to appropriate peer groups and market indices;
> investment management fees, expense ratios and asset sizes of
> the Fund itself and relative to appropriate peer groups; the
> Adviser's profitability from managing the Fund and other
> investment companies managed by the Adviser before marketing
> expenses paid by the Adviser; possible economies of scale; and
> possible financial and other benefits to the Adviser from serving
> as investment adviser and from affiliates of the Adviser providing
> various services to the Fund. In assessing the possible financial
> and other benefits to the Adviser and its affiliates, the benefits
> considered by the Trustees included research services available to*

---

[5]     The ICI describes itself as the national association of the U.S. investment company industry. Founded in 1940, its membership includes approximately 8,601 mutual funds, 604 closed-end funds, 110 exchange-traded funds, and six sponsors of unit investment trusts. Its mutual fund members have 86.6 million individual shareholders and manage approximately $7.2 trillion in investor assets. The quotation above is excerpted from a paper entitled *Understanding the Role of Mutual Fund Directors,* available on the ICI's website at http://www.ici.org/issues/dir/bro_mf_directors.pdf.

> *the Adviser by reason of brokerage business generated by the*
> *Fund*.

[Emphasis added.]

87.    Despite this acknowledgment that the Trustees are required to, and do, review the

very information which, as alleged above, shows that the fees here were excessive, the Trustees

renewed the fee contracts at issue and failed to conduct an effective negotiation on behalf of the

Funds.  They did this despite their knowledge that the Scudder Funds' performance was lagging

and management was poor; the fee schedule was established at a time when the services

provided by the Investment Adviser Defendants was far superior to the Investment Advisers'

more recent performance; the fees were more expensive than that charged by similar funds; and

economies of scale were not being passed on to the Funds or their shareholders.

88.    The Trustees' failure to effectively represent and defend the Funds and their

investors against the overreaching by the Defendants herein resulted from the fact that the

Trustees were captive to and controlled by the Investment Adviser Defendants, who induced the

Trustees to turn a blind eye to what fees were being used for and to approve all significant

agreements.

89.    Investment advisers control:

- the information that flows to the independent Directors;

- the board meeting agenda;

- the materials prepared and presented at the board meetings, therefore "framing the issues";

- who presents items at the meetings;

- who is involved in educating and advising the independent Directors.

*Management Conflicts Dominate Boardroom*, Fund Directions, No. 7 , Vol. 13, July 1, 2005.

Thus, it is clear that the Investment Adviser Defendants are in a position to control the

information and actions of the Directors, making it critical that the Directors fulfill their duties to

evaluate the fees and ensure they are not excessive. Here, however, that did not occur.

90.     In many cases, key Scudder Funds Directors or Trustees were employees or

former employees of the Investment Adviser Defendants and were beholden for their positions,

not to Scudder Funds investors, but, rather, to the Investment Adviser Defendants they were

supposed to oversee. For example, Richard T. Hale, a Trustee and Vice President of Scudder

Funds, has served as Chairman of the Board, Managing Director of Deutsche Bank Securities

Inc. and Deutsche Asset Management, and Vice President of Deutsche Asset Management, Inc.

During the relevant period, Hale oversaw 82 portfolios within the Scudder Fund complex.

William F. Glavin, Jr. was a Trustee and President of Scudder Funds and, during the relevant

period, served as Managing Director of Deutsche Asset Management, President of Scudder

Investor Services Corp., President of Scudder Service Corp., President of Scudder Financial

Services, Inc., Vice President of Scudder Distributors, and officer and/or trustee, as the case may

be, of 33 of the investment companies in the Scudder Fund complex. During the relevant period,

Glavin oversaw 82 portfolios in the Scudder Fund complex. Moreover, according to a former

employee who previously held an executive position at Scudder, some of the Boards were

comprised of members that were friends of the Scudder family or local people and all were hand-

picked by the former CEO George Johnson. The Trustees served for indefinite terms at the

pleasure of the Investment Adviser Defendants.

91.     The Trustees received substantial compensation for serving on Scudder boards.
According to the Scudder Blue Chip Fund Statement of Additional Information, dated January
31, 2003, the Trustees' salaries ranged from $157,346 to $180,000.

92.     In theory, the fees charged to Fund investors are negotiated at arm's-length
between the Fund board and the investment management company and must be approved by the
independent members of the board.  However, as a result of the Trustees' dependence on the
investment management company, as described above, and their failure to properly manage the
investment advisers, millions of dollars in assets belonging to the Funds and their investors were
transferred through excessive fees to the Investment Adviser Defendants and their affiliates, all
Defendants herein, that were of no benefit to Fund investors.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring these claims individually and also as a class action pursuant to
Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or
entities who held shares of any of the Scudder Funds at the date of commencement of this action
and who continue to hold any such shares, for the purpose of asserting the claims of those
persons under Sections 36(b) and 48(a) of the ICA to recover excessive fees on behalf of the
Funds in which they hold their interests (the "Class").  Excluded from the Class are Defendants,
members of their immediate families and their legal representatives, heirs, successors or assigns
and any entity in which Defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time
and can only be ascertained through appropriate discovery, Plaintiffs believe that there are many
thousands of members in the proposed Class.  Record owners and other members of the Class

35

may be identified from records maintained by the Scudder Funds and the Investment Adviser Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

95.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the Investment Company Act was violated by Defendants' acts as alleged herein; and

        (b)     to what extent the members of the Class and the Funds have sustained damages and the proper measure of damages.

98.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against The Investment Adviser and Distributor Defendants Pursuant To Section 36(b) Of The Investment Company Act On Behalf Of The Scudder Funds

99.     Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

100.    This Count is brought by the Class (as Scudder Funds securities holders) on behalf of the Scudder Funds against the Investment Adviser and Distributor Defendants for breach of their fiduciary duties as defined by Section 36(b) of the Investment Company Act.

101.    The Investment Adviser and Distributor Defendants had a fiduciary duty to the Scudder Funds and the Class with respect to the receipt of compensation for services and of payments of a material nature made by and to the Investment Adviser and Distributor Defendants.

102.    The Investment Adviser and Distributor Defendants violated Section 36(b) by charging investors in the Scudder Funds excessive investment advisory fees, Rule 12b-1 marketing fees, and service/ administrative fees, as alleged above.  The fees received by the Defendants were so disproportionately large that they bore no reasonable relationship to the services rendered, and would not have been the result of an arm's-length negotiation.  By reason of the conduct described above, the Investment Adviser and Distributor Defendants violated Section 36(b) of the Investment Company Act.

103.    As a direct, proximate and foreseeable result of the Defendants' breach of their fiduciary duty with respect to compensation received by them, Scudder Funds and the Class have incurred many millions of dollars in damages.

## COUNT II

### Against Deutsche Bank For Violation Of Section 48(a)
### Of The Investment Company Act On Behalf Of The Scudder Funds

104.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

37

105.    This Count is brought pursuant to Section 48(a) of the Investment Company Act against Deutsche Bank for the procurement of the acts by the Investment Adviser and Distributor Defendants alleged herein.

106.    The Investment Adviser and Distributor Defendants are liable under 36(b) of the Investment Company Act to the Scudder Funds as set forth herein.

107.    Deutsche Bank directly and indirectly caused the Investment Adviser and Distributor Defendants to engage in the violations of the Investment Company Act alleged herein.

108.    Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, Deutsche Bank is liable to Plaintiffs to the same extent as are the Investment Adviser and Distributor Defendants for their primary violations of Section 36(b) of the Investment Company Act.

109.    By virtue of the foregoing, Plaintiffs and other Class members are entitled to damages against Deutsche Bank on behalf of the Scudder Funds.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as the Class representatives and Plaintiffs' counsel as Class Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members on behalf of the Scudder Funds against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

38

C.     Ordering an accounting of all Scudder Funds-related fees, commissions, and Soft Dollar payments;

D.     Ordering restitution of all excessive fees and charges;

E.     Awarding such other and further relief as this Court may deem just and proper, including any extraordinary equitable and/or injunctive relief as permitted by law;

F.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: December 19, 2005.

**MILBERG WEISS BERSHAD &
SCHULMAN LLP**

By:  /s/ Janine L. Pollack (e-filing signature)
       Steven G. Schulman
       Jerome M. Congress
       Janine L. Pollack
       Kim E. Miller
       Michael R. Reese
One Pennsylvania Plaza
New York, New York  10119-0165
(212) 594-5300

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
Tel.: (610) 667-7706
Fax: (610) 667-7056

**STULL, STULL & BRODY**
Jules Brody (JB - 9151)
Aaron Brody (AB - 5850)
6 East 45th Street
New York, New York 10017
Tel.:   (212) 687-7230
Fax: (212) 490-2022

*Lead Counsel for Plaintiffs*

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
The World Trade Center – Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland 21202
Telephone:     (410) 332-0030
Facsimile:     (410) 685-1300

*Additional Plaintiffs' Counsel*

40

## CERTIFICATE OF SERVICE

I, Tatiana V. Rodriguez, do hereby certify that on December 19, 2005, I caused a

true and correct copy of the Consolidated Amended Class Action Complaint to be served by U.S.

Mail upon the following:

**SCHIFFRIN & BARROWAY, LLP**
Marc A. Topaz
Richard A. Maniskas
280 King of Prussia Road
Radnor, Pennsylvania 19087
(610) 667-7706

**STULL, STULL & BRODY**
Jules Brody
Aaron Brody
Tzivia Brody
6 East 45th Street
New York, New York  10017
(212) 687-7230

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
Marshall N. Perkins
The World Trade Center - Baltimore
Suite 2525
401 East Pratt Street
Baltimore, Maryland  21202
(410) 332-0030

**WEISS & LURIE**
Joseph H. Weiss
551 Fifth Avenue
New York, New York  10176
(212) 682-3025

**LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
200 Broadhollow Road, Suite 406
Melville, New York  11747
(631) 367-7100

**MORGAN LEWIS & BOCKIUS, LLP**
Christopher P. Hall
Todd D. Brody
101 Park Avenue, 44th Floor
New York, NY 10178
Tel: (212) 309-6000

**KIRKPATRICK & LOCKHART NICHOLSON
GRAHAM LLP**
Joanna A. Diakos
599 Lexington Avenue
New York, New York 10022-6030
(212) 536-3900


Tatiana V. Rodriguez